Appeal 2014-10 and 2014-11. We'll first hear this morning from Mr. Grill. I advise all council to try to, as best they can, pay attention to the time. And I'll also try to monitor that as well. So we'll first hear from Mr. Grill. Great. Good morning, Your Honors. May it please the court, my name is Andrew Grill and I represent Pallant Gregory Ernst. The District Court erred when it denied Ernst qualified immunity on Mr. Taylor's race-based employment discrimination claim. And to demonstrate this error, I want to start off by talking about why probable cause matters in the context of Plaintiff's employment discrimination claim. It matters because probable cause provides an objective measure of the reasonableness of Ernst's participation in plaintiff's disciplinary proceedings. And if Ernst's actions are objectively reasonable, he could not have violated Mr. Taylor's constitutional rights, which means he is entitled to qualified immunity. Ernst's participation in Mr. Taylor's disciplinary proceedings was reporting and testifying about his investigation and arrest of plaintiff for multiple crimes and recommending plaintiff be fired based on his reasonable belief that plaintiff committed those crimes. The facts agree, Mr. Excuse me, Mr. Grill, do you agree that for purposes of this appeal, we have to take as true Mr. Ernst's repeated use of the N-word both about and directly to Mr. Taylor and must assume that he acted out of racial animus? Your Honor, we concede for language, but the use of a racial epithet does not on its own transform his termination recommendation into an equal protection violation. The question is not whether Ernst's conduct was offensive, upsetting, crude, or humiliating. The question is whether Ernst recommended whether we can assume and must assume racial animus in his actions. I realize that's not the entire case, but can must we assume that much? I disagree, Your Honor. We can assume that he had racial animus, but that it was not the reason that he recommended that Mr. Taylor be fired. So do you want to do you want to debate then the issue of causation on this appeal? Yes, Your Honor. And how do we how do we have jurisdiction to decide a the District Court's articulated facts on summary judgment, which are clearly set forth in the statement of facts in his brief on appeal. And by accepting the District Court's facts and limiting his appeal to the facts as assumed by the District Court, Defendant Ernst has not intersposed disputed facts. Defendant Ernst's brief sets forth and identifies all the facts considered by the District Court regarding qualified immunity and accepts those with jurisdiction. But causation really doesn't have much to do with qualified immunity, does it? And we really have to concentrate on what it was that Mr. Ernst what the evidence indicates he did. The evidence, Your Honor, establishes that as a matter of law that Ernst's investigation and arrest of Mr. Taylor was objectively reasonable under the Fourth Amendment. Those facts that the District Court cited in its opinion established probable cause. And the thing that makes this case so unique, Your Honor, is that when Ernst, his participation, because that's really what the employment, you know, Fourth Amendment Equal Protection Claim or 14th Amendment Equal Protection Claim centers on, the facts that the District Court based this decision on are the same facts that caused Ernst to recommend that Mr. Taylor be fired. Ernst didn't make those facts up. In fact, the plaintiff didn't even dispute those facts on summary judgment. Those facts prove that Ernst's recommendation to fire a plaintiff was not pretextual. Rather, it was based on his reasonable belief that plaintiff committed multiple crimes. The difficulty I have with that, Mr. Grill, is that it really doesn't come to grips with the very well-established doctrines of, in essence, discriminatory discipline. I mean, first of all, there may be factual issues about what it was Mr. Taylor actually did, and I'll have some questions for you about that. But assuming that, I mean, police officers do bad things all too often, and not all of them are fired for them, and if there's racial discrimination in the way those decisions are made, that's a Title VII and an equal protection problem, right? Yeah, that's correct, Your Honor. But the facts, as the District Court found them, provide a non-discriminatory rationale for Ernst's termination. That's not the point. The fact that there is a legitimate, that there may be a legitimate basis for termination doesn't resolve the equal protection issue. Your Honor, if the facts that Ernst based his termination recommendation are not in dispute, and they establish that he committed a crime, then no reasonable jury could conclude that Ernst recommended that plaintiffs be fired, or that his recommendation would have been any different had plaintiffs not been a member of a protected class. We have people in the- That's completely wrong under well-established Title VII and equal protection jurisprudence. If I could ask you, you've argued, we get into this debate about the state of the law of cat's that racial discrimination by state actors, including state actors involving public employment issues, was unconstitutional. And there was some discussion in the briefs of Smith against Bray and its discussion of the state of the law on cat's paw under constitutional provisions back in 2011, 2012. And that case identified authority from several circuits, essentially saying that in a cat's paw case, the racially or unlawfully motivated actor could be held individually liable, that that was wrongful conduct. Can you direct us to any contrary authority on that question? Well, Smith v. Bray, as an initial matter, Your Honor, concerns individual Section 1983 liability of supervisors who caused or participated in a constitutional deprivation. Ernst wasn't a supervisor, and that's a big distinction between the facts of this case. Could you answer my question, please? The question was whether I can identify any authority to the contrary? Yes, on cat's paw involving public employment. I am not aware, Your Honor, of any cases that would clearly establish that Section 1983 can subject an individual liability on an unlawfully motivated subordinate that recommends that a final decision maker take an adverse employment decision against another employee. That was in effect in 2011. So what would have been the legal argument in 2011 that would suggest it was permissible for a police officer to cause another officer to be fired based upon actions taken for racial reasons? Well, our position, Your Honor, has always been that Ernst's actions were not, his recommendation to fire Mr. Taylor was not due to Mr. Taylor's race. We went over that. We have to assume it was based on race for purposes of this appeal. We have to assume. What's the argument in 2011 that would lead a reasonable police officer to think, based on my racial animus, I can get this colleague fired? Well, there was nothing to have put Ernst on notice in 2011 that as a subordinate who's making a recommendation to a supervisor who is charged with actually making the recommendation, the final recommendation to terminate, that if he recommends that another employee should be fired for committing crimes that there was probable cause that would establish a reasonable belief that Mr. Taylor had indeed committed those crimes, that his racial animus would somehow subject him to a constitutional violation simply because he has allegedly used discriminatory language yet there's no dispute that Mr. Taylor reasonably committed those crimes. I think we're going in circles then. Let me just ask you if I could, Mr. Gryll, to address the evidence plaintiff has cited to the effect that the damage to Mr. Woolfolk's vehicle came from two different guns and from the wrong direction in light of Mr. Woolfolk's story. Thank you, Your Honor. Well, our argument is dependent in large part on probable cause and that it demonstrates Ernst's reasonable belief that Percy Taylor committed those crimes. There's no evidence. Could you address the plaintiff's evidence to that effect? Yes. So there's no evidence that is in the record that Ernst knew at the time he was investigating this incident that the vehicle could have been facing in any other direction. There were photographs taken of the vehicle. The CPD report indicated that it was facing in the direction that the shots came from. That piece of evidence didn't come out for about maybe five, six years after the fact in a deposition given by the car owner. So the standard from our point of view, that fact does not change the facts on the ground as Ernst knew them. The investigators didn't check into that as part of their original investigation? There was nothing in the record that would suggest that they should have, Your Honor. And they did not? They did not. They took the scene as they found it and there was nothing in the record to suggest that the car had ever been moved. There were no tire tracks. There was nobody that said the car was facing a different way. That wasn't an issue that came out until years and years later. And that's true or not is debatable, but the fact remains that at the time Ernst investigated this, there was nothing to suggest that the car had been moved. Thank you. Mr. Grell, your time has expired, but I will allow two minutes for rebuttal. I appreciate that, Your Honor. Thank you. All right. We next will hear from Mr. Rizzo. Good morning, Your Honors. May it please the court. My name is Vincent Rizzo and I am representing today under Sheriff Whitler and Director Ways. Your Honors, this is a separate appeal by two executive officials for the Cook County Sheriff's Office who are sued in their individual personal capacities for recommending plaintiff's termination because of evidence presented to them that he shot without provocation at an unarmed neighbor. Qualified immunity exists for this exact situation to shield officials from liabilities when they perform their duties reasonably. Under Sheriff Whitler and Director Ways respectfully ask this court to reverse the district court's decision denying qualified immunity as the immunity as they did not violate plaintiff's constitutional rights and plaintiff has cited no case law or any other law establishing otherwise. And in support of that, we today present two main issues. One is that under Sheriff Whitler and Director Ways cannot be held personally liable under Section 1983 as they had no discriminatory purpose when making their recommendations. Under Iqbal and cases that follow it, defendants may only be personally liable for their own constitutional violations and their own discriminatory purpose. Second, the undisputed evidence of misconduct that Mr. O'Grill touched upon provides an objectively reasonable basis for the recommendations to terminate plaintiff. Now, Your Honors, as to our first point, which really addresses a threshold legal issue of whether or not Section 1983 can even be imposed here on Whitler and Ways, the answer really is a simple no. Given the complete absence of any evidence of discriminatory purpose on the part of Whitler and Ways, the U.S. Supreme Court in Iqbal and this circuit post-Iqbal have made it very clear that a defendant may only be liable for their own misconduct and for their own discriminatory purpose under Section 1983. The discriminatory intent of another cannot be imputed to a defendant under 1983. Now, Mr. Rizzo, can I ask you a couple of questions about the interaction of the 1983 claims and the Title VII claim against the Sheriff's Office more generally? Sure. I take it you represent Ways and Whitler individually and the Sheriff's Office has separate representation, correct? I also represent the Sheriff's Office as to... Okay. Well, that may simplify things a bit here. As I understand it, and correct me if I'm wrong, Ways and Whitler are saying, in essence, we reviewed the investigation we got from Ernst and others for correctness, completeness, and thoroughness, but we did not undertake our own independent investigation. Is that right? Well, we dispute that they didn't undertake an independent investigation. Our argument as the and investigated it. But for our purposes here, as it relates only to the 1983 case, our argument is simply that there is no evidence that they had a discriminatory intent. And as it relates to the Title VII claim, Title VII allows the racial animus of a subordinate to be imputed to the entity. 1983, though, is different in the sense that there has to be that personal liability because we're holding someone personally liable for constitutional violations. So you're trying to basically maintain the defense of the two separate claims on somewhat different grounds. Lack of personal responsibility for any racial animus on the part of Ways and involved enough, doing enough of their own investigation to defeat plaintiff's cat's paw theory under Title VII in the case against the sheriff's office. Is that right? That's correct. So their meaningful review cut any sort of chain in terms of investigator Ernst's alleged racial animus. Go ahead. And judge, just to kind of point out the inconsistencies with the court's theory, as it relates to the cat's paw theory, since we're discussing the Title VII claim now, the district court in assessing the plaintiff's Title VII claim found solely that the Title VII claim could proceed under a cat's paw theory, which necessarily assumes that Whitler and Ways were innocent. So the district court really can't have it both ways. And plaintiff also relied solely on the cat's paw theory. So both cannot have it both ways where you have a decision saying that the decision makers or the ones who recommended the decision were innocent. And then at the same time saying that they were personally liable because they had a discriminatory intent. So there's no evidence whatsoever in the record that undersheriff Whitler and director Ways had a discriminatory intent. The district court here erred by saying otherwise. And when it's sua sponte, since plaintiff completely withdrew his 1983 claim as against Whitler and Ways on summary judgment. So the district court erred when it's sua sponte and posed 1983 personal liability on that. The district court simply. Thank you. Could I ask you a couple of factual questions, Mr. Rizzo? First, is there evidence in the record that black staff from the Office of Professional Responsibility were removed from Mr. Taylor's case? There is no evidence as to that. And even if there were, it really wouldn't go to the issue here. Undersheriff Whitler, who is African-American herself. You made that point numerous times in your brief. So both those. What about Ways? Ways was in the OPR, right? That is correct. He's the executive or was the former executive director of OPR. But we have to look at what director Ways and undersheriff Whitler did, what they did. So you say that didn't happen. That is correct. Okay. Second question. Could you address this evidence that plaintiff has relied upon to the effect that the damage to the vehicle came from two different guns and was from the wrong direction to be consistent with Mr. Woolfolk's accusations? Your Honor, as to that fact, we wholly agree with Mr. Grill here. That evidence came out in a deposition for the civil litigation. It has nothing to do with what anyone knew at the time of the investigation. There was no evidence suggesting that the car was moved. And there was an evidence technician that came onto the scene immediately and observed the scene. And again, this case started by two private citizens who called not the sheriff's office, but a completely different entity, the Chicago Police Department. Thank you. So Your Honor, again, there can be no personal liability against undersheriff Whitler and director Ways. There simply is no evidence that they, at any discriminatory intent. And at this point, I see that I'm at a minute and 40s, and I'd like to reserve the rest of that time for rebuttal unless this panel has any further questions. Okay. We'll honor that, Mr. Rizzo. And thank you. And we'll now hear from Mr. Linden. Thank you, Your Honors. Good morning. May it please the court, I, along with Peter Bustamante, represent Percy Taylor, just put a little personal nature. Mr. Taylor's life was really turned upside down in driven by racial hatred, racial animus. And I think, I think, you know, Justice Hoffman concurred that Mr. Grill acknowledged that there was racial animus here. May I can't think of a case where we're gonna have more racial animus and hatred from fellow PR investigator, they have no reason to lie, no reason to make it up. In fact, it would have been against his best interest to implicate a fellow OPR officer. And really allegations and evidence that Mr. Yvette makes against investor Ernst is, it's really deplorable, has no place in the civilized society. And it just strains all notions of credibility to think that somebody could use N-word repeatedly throughout the investigation, during the investigation, at the merit board hearing, casting Mr. Taylor outside in the hallways saying, you better quit N-word or I'm gonna get you or whatever else he said. They called Mr. Taylor, referred to him as a gorilla, his wife Crystal's a gorilla. And it's just completely deplorable. We're familiar with that evidence, Mr. Linden. Could I ask you to focus on the claims against Mr. Ways and Ms. Whittler? Sure. And identify, if you would, any evidence of racial animus on their part, which I did not see, or any evidence that they knew of Ernst's animus or bias, which I also didn't see. It's, I don't think there's direct evidence of racial bias. I mean, I don't think in many cases you're gonna have it. But I think you asked Mr. Russo if there's any evidence of any black OPR investigators being removed. And I know it's in our brief and I know it's in our statement of facts, but two of them were taken off the investigation. One was Henry Hemphill. And Cheryl Collins, I think, are the two that were taken off. Because originally they sent, it was like a bunch of stormtroopers. They sent everybody to Mr. Taylor's house, terrorized his wife and kids, blocked their vehicle. And Mr. Hemphill and Mr. Collins were part of the original search warrant, I think, to guard the perimeter, whatever in the heck it was. And they were removed. And Mr. Hemphill, I don't know if your honors had a chance to read it, but he had a different story where they sent him to investigate a different person. And he was told, basically before the investigation began, that this person filed a civil rights action and made racial accusations that we want this person removed. So there is evidence of two black OPR officers being removed from the investigation. And we have that as part of our summary judgment record on appeal? I know it's in the summary judgment. If it's not in the brief, I can't remember, but I think it may be in the brief, but I know it's part of our statement of additional facts that were submitted to the district court. Okay. And with respect to individual liability of Weis and Whitler, I think the court wants me to try and concentrate on, yeah, I've read Iqbal, I don't know, 20 times and trying to figure the whole Iqbal out. I know that involved two very, very high level administration officials, Robert Mueller, the head of the FBI, and I think it was Ashcroft, the U.S. Attorney General. But if you look at the cases that we cite, and we cited one case post Iqbal, and that case was Baca's case versus Village of Peoria Heights 62, Fed Third, that was decided in 2011. But in that case, they still use that supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must, in other words, act knowingly or with deliberate, reckless indifference. And I spent a lot of time after because that argument was more raised in their reply brief, so I didn't concentrate too much trying to find pre-Iqbal decisions from all nine. But I did a search just turning blind eyes supervisory 1983 liability. And there's a slew of some circuit court opinions that use the same standard that supervisors can be liable if they turn a blind eye, and that's probably... That's correct, but ignorance is not necessarily turning a blind eye. So I gather there's no apparent evidence of their knowledge of Ernst's bias in this record. I don't know of any direct evidence to be frank, but turning a blind eye, I don't think they have to have evidence that they knew that... I think it's a question of fact how ignorant they were, whether or not it really rises from 1983 level. So what's the best evidence that they knew of Ernst's bias, which we must assume for purposes of this appeal? They knew the deficiencies in the investigation, or at least Whitler did. Now, we decided, I think it was an April 13th, 2011 memo written by Dwayne Holbrook, the then chief of the sheriff's police, to Ms. Whitler. She took an active role. Something was going on. Ms. Whitler testified that she does thousands of command channel reviews, that she, in essence, never gets involved in the disciplinary proceeding until the command channel review. Here, she got involved in the Laudermill hearing, which is scheduled, according to our police expert, contrary to law enforcement practices, before the investigation was even done. She wrote a letter, I think it was April 12th, to Chief Holbrook, saying she disagreed with the Laudermill decision. He responded the very next day, pointed out, cited, sure, the weaknesses in the evidence, defended the Laudermill board, suspending them with pay, talked about the weaknesses in the evidence, the fact that they never pulled Woolfolk's lengthy criminal record, that they ignored, I think they said ignored exculpatory evidence that he said, she said case, put the police department off time and time again from an investigative file. So whether she knew or not, I think there's circumstantial evidence that she acted inappropriately. I don't think we're ever going to have direct evidence to show she knew exactly this racial bias. So- Mr. Linden, how do we get to her state of mind? Is it all circumstantial? It would be. I mean, she's not going to admit that she's a racist. I know Ms. Rizzo makes big points saying she's African American, so somehow she can't be racially biased. No, I don't think that's so. You can discriminate regardless of what race you are. But yeah, I think the main gist of it is facilitating or turning a blind eye. Both of these individuals were responsible. Ms. Whitler signed off on the command channel review that our police expert basically said was nothing but a rubber stamp. Mr. Ways signed off on the summary that apparently was written by Gregory Ernst. He signed off on the summary and yet he is part of the command channel review that in essence reviewed his own findings. Well, Mr. Linden, could you speak to what you think the supervisors might have done more to help us find the state of mind situation? I think made sure that there was a proper investigation. Either they had discriminatory intent or just didn't give a darn. I can't get up here and say that they signed off on this investigation because they knew the investigation was tainted by racism. I'm not going to say that and it wouldn't represent that to the court, but at least certainly under the blind eye theory that they either condoned it or turned a blind eye for fear of what they might see. Well, is it your view that on the face of it, the investigation speaks to a failure to go further or there are facts that should have been apparent to them that required a more in-depth investigation? I think both. I think our police expert lays it out in the report that the command channel review was so deficient that they either should have looked at it and said these charges should not be sustained based on evidence. There's no corroborating evidence. Ms. Whitler knew at the time she did the command channel about the weaknesses and the evidence is evidenced by the letter that Chief Holbrook sent her and that they knew. We have Robert Johnson, their police expert, he's really an award winning, but a lieutenant colonel retired from the Illinois State Police who outlines in his report that was part of the summary judgment submissions about the many, many deficiencies that they never mentioned any exculpatory evidence. There's no mention of a weapon being found or not being found. Did the expert speak to any comparative investigation where we might look to see whether this had a less than sufficient review or is it just a subjective, albeit qualified, I'm not questioning the expert, but just a subjective assessment that the procedures here aren't as scrupulous as he would suggest there ought to be. In other words, how freestanding is this particular investigation as far as others in the view of the expert? I mean, he opined and gave facts. I know he's done thousands of investigations that the standard practices, national standards, require a rudimentary step such as canvassing the area, looking to see if there's any witnesses, at the very least, you'd inspect the truck and try and find out where it was parked. I think Justice Hoffman had a good question. Well, why wouldn't he try and find out what direction the truck was? And when we deposed Mary Wolf, the owner of the vehicle, we asked her, where was the truck parked? She said, well, when I came before it happened, I saw the truck parked with its rear end facing the third floor window. If Ernst would have even looked up the third floor window, we submitted pictures with our summary judgment submissions and Robert Johnson went out there and he stood, and I was with him, stood in the spot from where Wolf will claim the truck was. Percy Taylor was in the window of the, I think it was a plastic BB gun, and he couldn't make out his face. He testified about the account that Wolf gave, I think he claims he's in the truck, and heard a couple piffs, poofs, and went down and then looked up and somebody's shooting at he looks up in the window and says, I got you, Mr. Taylor. There's no mention of any animosity between Wolf, Hulk, and Taylor, which we clearly set forth evidence that they had disputes in the past. And, you know, Wolf, Hulk had every reason in the world to have this personal animosity and what would, is it your view that no further discovery would be needed to buttress the position you take on the supervisors? I don't think so. I don't think we're going to, you know, find direct evidence of... No, I was thinking more along the lines of comparative investigations, that's all. Possibly. I mean, we didn't really, you know, get comparative. I know he talks about comparative punishment, saying that they, you know, the recommendation for termination was inconsistent and severe compared to the way they treated other similarly situated individuals, but that was a factor. It's a good question, but we didn't really go into that. I'm sure Mr. Johnson at trial could expose with specific examples. Well, as you can see, it's looking at our case law, this issue of the state of mind is of some concern to me, and I appreciate your answers and just trying to assemble the best factual basis to analyze this case itself. Thank you. It's just a difficult question when, you know, most people don't show overt racism. Understood. It's a rare case. Lyndon, is there any Monell claim against the Sheriff's Office or the Merit Board? No, we dropped the Monell claim, so we just have a Title VII claim against them. Thank you. It just seems like a panel is so well aware and impressed, really, by your knowledge of the case, and, you know, I've got a script, I can talk for another half hour. I don't think anybody probably wants me to do that, but maybe this argument might be better served if anybody has any other questions. I think we set forth law. I mean, I'd just like to really emphasize turning a blind eye, and I've been trying to reconcile that line of cases with Iqbal, and it's difficult to do, and I just don't think it applies, and based on, the circuit's precedent over and over and over again. You know, and I could say, you know, the court five cases, if you want to, if you go on Westlaw or Lexis and just do a search of turning a blind eye in 1983 liability, that language comes up over and over again, and I know you're obviously not bound by the district courts, but there's over 100 district courts that have applied that standard, so that's pretty much the standard that we're going by, and I know I've still got about four minutes left, but I'm happy to entertain any questions. I believe the district court was correct. I mean, number one, I don't know how Gregory Ernst can get up there and say it wasn't clearly established that I can have racial animus. There's certainly evidence that racial animus tainted his Gregory Ernst was a proximate cause of Taylor's termination. He was the only witness that testified at the Laudermill hearing. He testified at the merit board hearing. He drafted the summary report that led to the command channel review. Judge Rowland, before the district court, found that there's a question of fact whether or not Ernst was really the operative decision maker, and Judge Rowland went through it and said why, that there's really no evidence that either Ways or Whitler really did anything except sign off on the recommendation. So for those reasons, and I know we set forth in our brief, I know Judge Hoffman had a really good question about, you know, aren't there questions of fact with respect to causation? I mean, I think these, both these appeals as we set forth in our motion dismissed, it was taken with the case. Questions of fact really are plentiful in this case, that it's our position the court does not have jurisdiction, that as the court's aware, if there's any questions of fact needed to resolve qualified immunity, then there's no jurisdiction for interlocutory appeal. We set forth too in our brief that really the issue of qualified immunity, if you look at their summary judgment submissions before the district court, they were not in our judgments sufficiently developed to enable the district court to make an informed decision for us to give a meeting response. So there is case law shown that, you know, they should have be deemed to have waived any qualified immunity defense. So for those reasons, we ask that this court affirm the judgment of the district court, but thank you for your time. Thank you, Mr. Linden. Mr. Grill. Thank you, Your Honors, again for the additional time here. I want to just kind of circle this back to what I and Mr. Ernst believes is the most common sense way to look at this. And I just want to lay out for the court here quickly what the undisputed facts are. And I think that's just a really, really important part of this case in this appeal. These are the facts known to Ernst that Mr. Taylor nor the district court disputes. When this whole thing got kicked off, when the victims called 911, the Chicago Police Department responded to the scene of the incident and conducted a preliminary investigation. They spoke to the victims. They observed damage to the victim's vehicle that was consistent with their accounts. Ernst and his OPR investigators conducted their own investigation. An eyewitness, that was Woolfolk, told Ernst that he saw Mr. Taylor, who is his neighbor, who he knew from close range, shoot a BB gun at him and at his other neighbor's truck. Ernst then observed damage to the truck, that looked to have been caused by BB or pellet strikes in the locations that Woolfolk said were hit by the truck. This damage was then photographed by Ernst's investigators. And then the eyewitness personally identified Taylor on scene as the shooter to Ernst. Any reasonable person in Ernst's position would know that these facts, knowing these facts at the time that Ernst learned them, would have reasonably thought that Taylor had committed these crimes. We have to ask ourselves, even considering the evidence of Ernst's racial animus in this case, was he supposed to ignore this? That's what makes this case so different. These facts that establish a reasonable basis to fire Mr. Taylor, no one contests them. We can talk all day about what he could have done or should have done in the investigation, which is a big argument that Mr. Earl's had probable cause, there's no constitutional obligation on his part to investigate further or search for any. Mr. Earl, that's correct in cases alleging improper arrest. But it's far from clear to me that that applies for the year, months and years that Ernst continued to pursue the removal of Mr. Taylor from the force. Thank you for your question, Your Honor. Well, first point, Ernst's participation in the disciplinary proceedings that you're referring to was based on that arrest. And there's no evidence in the record that Ernst fudged any of his testimony or lied in those proceedings. In fact, there was an entire trial that was conducted before the mayor board with judges, evidence, witnesses, lawyers, Ernst testified, Mr. Taylor testified, and the decision to fire him was still reached after all that. If Ernst had recommended that Mr. Taylor be fired because of his race, if that really was the case here, there would be some evidence in the record that Ernst manipulated some evidence underpinning his termination recommendation in a way that showed them that an objective basis to fire him or to recommend to fire him was lacking. And that's just never been the case here. That's the part that the plaintiff's case has always been missing. Yeah, we have evidence of racial bias, but that's only half of the issue. There has to be evidence that he was fired because of his race. And you just can't say that under these facts. These facts, unlike many cases that establish a reasonable basis to fire him, they're simply not contested. So for those reasons, Your Honor, we ask that this court reverse the district court's decision to deny Ernst qualified immunity on Mr. Taylor's race-based equal protection employment discrimination claim. Thank you very much for all of your time today. Thank you, Mr. Grell. We'll now hear from Mr. Rizzo. Your Honor, plaintiff's counsel just discussed the blind eye theory. And that really is the only theory that they presented on appeal. But what they get wrong is that under a blind eye theory, they must have turned a blind eye to known unconstitutional conduct. They admit, they just admitted that there's no evidence that they knew of any sort of unconstitutional conduct. And so it would be completely inconsistent with well-established case law in this circuit and in the Supreme Court to say that it's sufficient for an official to turn a blind eye to some deficiencies or shortcomings in an investigation. The case law is very clear that for a blind eye theory to apply, the officials must know about the unconstitutional conduct and then do something to further that discriminatory conduct. But there's no case law that somehow implies that turning a blind eye to something other than unconstitutional conduct can be sufficient to impose personal liability on two officials. And just briefly, Your Honor, as to the removal of the black officers, there's no evidence of that. There's no evidence that Whitler and Waze somehow did that. There's no evidence that, and furthermore, plaintiff's counsel didn't even raise that issue. And there's no evidence that those removals were based somehow on race. And it can't be inferred as much. So Your Honor, with that, we ask that you reverse the district court decision as it relates to qualified immunity with regards to the equal protection claim. Thank you. Thank you, Mr. Rizzo. Thanks, Mr. Linden and Mr. Grill for your arguments. The case will be taken under advisement.